**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

JOSHUA ROSS and
TARA ROSS,

        Plaintiffs,

vs.                                         Case No. 3:10-cv-496-J-37-JBT

THE UNITED STATES OF AMERICA,
JOHN DOE 1-50, and
ABC CORP 1-50

        Defendant.
_____/

## MEMORANDUM OPINION AND ORDER

This case is before the Court following a one day bench trial held on January 4, 2012. Having reviewed the pleadings, examined the evidence, observed the witnesses and weighed their credibility, and considered the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

### I. BACKGROUND

On August 16, 2009, Joshua Ross ("Mr. Ross") was injured while performing contract work aboard the U.S. Coast Guard Cutter Harriet Lane ("the Harriet Lane" or "the vessel") for his employer, Bailey Refrigeration ("Bailey"). Mr. Ross was working within the scope of his duties as a "longshoreman," when a hatch[1] on the vessel closed on his left hand, severing his left long and ring fingers and requiring a tendon repair and pinning of

---

[1] The "hatch" at issue in the instant action is described in detail in the "Findings of Fact," Part C., below.

the small finger.  He and his wife, Tara Ross ("Mrs. Ross"),[2] bring this action against the United States (sometimes referred to as "Defendant") in its capacity as owner of the vessel, under the Longshore and Harbor Workers' Compensation Act ("LSHWCA" or "the Act"), 33 U.S.C. § 905(b).  Suit against the United States is authorized pursuant to the waivers of sovereign immunity contained in the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918 and under the Public Vessels Act, 46 U.S.C. §§ 31101-31113.

## II.  FINDINGS OF FACT[3]

### A.    The Arrival Conference

Mr. Ross boarded the Harriet Lane on approximately August 3, 2009, about two weeks before the accident causing his injuries occurred.  Mr. Ross's employer, Bailey, had a contract with Defendant to upgrade the refrigeration unit on board the Harriet Lane.  On his first day, Mr. Ross attended an "arrival conference" (also referred to as the "meet and greet" or "kick off" meeting), at which he and another Bailey contractor met a few of the crewmen aboard the vessel.

It was at the arrival conference that Mr. Ross first met Lieutenant Matthew Gans ("Lt. Gans"), an "engineer officer" and the "contract officer technical representative" for the Bailey contract.  Lt. Gans served as the liaison between Bailey and the contracting officer for the coast guard.  In that capacity, he was expected to "know everything" pertaining to the contract.  At trial, he testified that his role required him to be "right in the thick of things" if a dispute arose between the contractor and contracting officer, and that he would

---

[2] Mrs. Ross is entitled to maintain an action for loss of consortium under 33 U.S.C. § 905(b).

[3] To the extent that any of the following facts may represent conclusions of law, the Court adopts them as such.

sometimes be called on to either "agree or disagree" with a contractor's recommendations.

Lt. Gans headed the Harriet Lane's "damage control department." According to Petty Officer Nicholas J. Wernicke ("FS2 Wernicke")'s trial testimony, the "damage control department" is comprised of "damage control men" whose "priorities" include "firefighting, scuttles, hatches," and "anything of that nature." FS2 Wernicke testified that at the time of the accident, Lt. Gans would have been the appropriate person to institute or revise any policies with respect to opening and closing hatches on the vessel.

At the arrival conference, Lt. Gans and Mr. Ross discussed various aspects of the contract work and vessel protocol. For example, Lt. Gans told Mr. Ross that the Bailey contractors needed to inform a member of the coast guard crew if they were going to perform any kind of "hot work" or "welding" on board. He also told Mr. Ross the hours during which the Bailey contractors could work on the ship, including the hours during which they could weld. Most relevant here, Lt. Gans discussed the operation of the "hatches" on the vessel. Pursuant Lt. Gans's instructions at the arrival conference, Mr. Ross understood the Bailey contractors were "responsible for" opening and closing the hatches without assistance from crew members, in part because the Harriet Lane had a "skeleton" crew, while contract work was ongoing. Although Bailey contractors would be expected to operate the hatches without coast guard assistance, Lt. Gans required them to notify duty personnel on the quarter deck when they opened or closed a hatch. Like the coast guard crewmen, the Bailey contractors had to report the hatch position so that it could be recorded on the "damage control log." Lt. Gans did not offer, and the Bailey contractors, did not receive, any type of training or instruction regarding the safe opening and closing of hatches on the Harriet Lane at the arrival conference or at any point

thereafter.[4] Lt. Gans believed that the Bailey contractors "had no problem opening" the hatches on the vessel without assistance.

Lt. Gans testified that after the conference, he sent an e-mail to Mr. Ross, the officers of the decks, the "Engineers on Watch," the Commanding Officer, and the Executive Officer, detailing his discussions with Mr. Ross about the Bailey contract work. He explained in his testimony that he wanted each of these individuals to understand the agreements he and Mr. Ross reached regarding when "we were scheduled to do hot work" and when "we weren't going to do hot work, so it was laid out to the entire upper echelon of the ship . . . [and everyone knew] what we [were] going to do [how] we [were] doing it, and when we [were] doing it."

### B.     Training for and Operation of the Hatches

The Harriet Lane has a number of hatches (also described as "hatch doors") which are an integral part of the safety and damage control on board the vessel.  The hatches contain codes, such as "X," "Y," or "Z" to designate when and under what conditions each hatch may be opened and closed.  (*See* Joint Ex. 5.)   It is undisputed that coast guard crewmen undergo training to learn how to properly open and close the various hatches.

The first and only time FS2 Warnicke assisted in opening a hatch on the vessel was at the time of Mr. Ross's accident.  It was his understanding that the coast guard crewmen would generally open the "scuttles and hatches" for contract workers, such as Mr. Ross,

---

[4] Uncontroverted testimony establishes that neither Mr. Ross nor Mr. Roberts ever received any training with regard to the opening and closing of hatches on coast guard cutters from any source.  According to Lt. Gans's testimony, the terms of the contract between Bailey and Defendant were silent on the operation of hatches, and did not represent that the Bailey contractors were skilled, knowledgeable, or experienced in hatch operations.

4

but as a junior officer, he was not authorized to do so. When he first boarded the Harriet Lane, he and the other first time crewmen received comprehensive training, which included at least one hour dedicated specifically to instruction on properly open and close the various hatches on the vessel.

CDR Van testified that it "was his expectation" that contract workers, such as Mr. Ross, would know how to properly open and secure hatches like the one involved in the accident.[5] He explained, however, that there was a "high probability" that his crew would have had the appropriate level of skill required to properly open the hatch, and that because of their training, he would generally expect them to open the "heavier," "more dangerous"[6] hatches for contract workers. Similarly, First Class Petty Office Keith S. Brown ("FSC Brown") testified that he believed new crew members would generally receive hatch training when they first boarded.

Finally, as previously noted, when a hatch was opened or closed, the individuals responsible for the maneuver were required to report it to the duty personnel on the quarter deck, who documented the hatch position in the "damage control log."  (*See* Joint Ex. 1.) It was essential to the safe operation of the vessel to record whether a hatch was open or closed so that the duty officers could ensure that all hatches were in the appropriate position in case of an emergency.

---

[5] In prior deposition testimony, however, CDR Van testified that he would not have expected contractors to open and close hatches. To reconcile this inconsistency, CDR Van explained that at the time of his deposition, he did not know that the Bailey contractors had been on board for two weeks before the accident and did not know their "level of experience" at that time.

[6] CDR Van testified that he would expect contract workers to freely pass through the smaller, light "scuttles" without assistance from coast guard crewmen.

## C.     Description of the Hatch at Issue[7]

The hatch that caused Mr. Ross's injury was comprised of two "doors" First, the "main hatch" was a heavy, white, square door. (*See* Joint Exs. 5, 6; Pl.'s Ex. 2.) The "main hatch," which was referred to as "the hatch" throughout the trial, closed on Mr. Ross's hand, causing his injury. While there was some minimal suggestion to the contrary, lifting the main hatch required two individuals, not only because it was heavy, but also pursuant to the vessel's "safety rules."[8] The hatch had a number of "securing dogs" or "dogs" that were underneath the deck. When the hatch was closed, the tops of the "dogs" were visible, and resembled large, flat screw heads. (*See* Joint Ex. 24.) The "dogs" secured the hatch in place. Once the hatch was closed, one would have to insert a tool, similar to a screwdriver, into the indentation in the center of a "dog" to loosen it. (*See* Joint Ex. 23.)

There were approximately seven "dogs" on the hatch. Once the dogs were loosened, the hatch cover could be lifted off the deck. The hatch cover was attached to the deck floor by two hinges set between the floor and the bulkhead behind the hatch. There were two small recesses with handles located near the front of the hatch cover, away from the bulkhead, so that one individual could stand on either side and use the handles to lift the hatch off the deck and back towards the bulkhead. (*See* Joint Exs. 18, 21.)

There was a "long steel fitting" protruding from the bulkhead that contained a "latch"

---

[7] At the beginning of trial, the parties stipulated that the hatch and its "latching mechanism" were in good condition and proper working order at the time of the accident. The following description is derived almost entirely from CDR Van's trial testimony.

[8] CDR Van testified that there were a few people on the vessel who were "physically capable" of opening the main hatch by themselves. He speculated that he "may have even picked it up himself when [he] tested it" the morning of the accident. The Court is persuaded from the evidence that properly opening and securing the hatch is a two man operation.

at the end.  (*See* Joint Exs. 19, 20, 30-33.)  When the hatch was in its upright, open position, the latch would be positioned on the rim of the hatch.  Once gripping the rim, the latch was held in place by a "pin."  The pin fit perfectly into a hole in the steel fitting, and when inserted correctly, would prevent the hatch from moving.  According to CDR Van, with that pin in place, the latch would not budge, and the hatch cover would remain firmly in its upright and open position, so that the passageway "could be transited without fear of the hatch closing."  It is clear from this testimony that operation of the hatch involved a certain level of skill and knowledge, and failure to follow the appropriate steps to ensure the latch and pin were in place could cause the hatch to become lose and fall abruptly.

Located in the center of the main hatch, there was a "scuttle."  (*See* Joint Ex. 18.)  The scuttle hole was large enough for individuals to pass through with ease, and there was usually no need to open the main hatch.  Opening the scuttle did not require two people, nor did it require the degree of skill and care required to open the main hatch.

### D.    Description of the Area Surrounding the Hatch

Mr. Ross and the other Bailey contractors worked in two areas of the vessel.  On the day of the accident, Mr. Ross and his supervisor,[9] Mr. Douglas Roberts,[10] were working in the "dry storage area" or "dry store," which was located directly beneath the vessel's locker room.  To descend to the dry storage area, the Bailey contractors would go through the scuttle or the hatch, described above, and climb down a ladder.  (*See* Pl.'s Exs. 2-4.)  It is

---

[9]  Mr. Ross supervised the job on the Harriet Lane, but Mr. Roberts would generally be considered his "supervisor."

[10]  Mr. Roberts was unavailable to testify at trial.  On Plaintiff's motion, the Court admitted his deposition testimony, which was taken on May 10, 2011.  It reviewed the entirety of the deposition, considering the parties' respective objections.

undisputed that coast guard crewmen continuously passed through the scuttle or hatch to get to the dry stores area while the Bailey contractors worked in that area; FS2 Wernicke passed through the scuttle just moments before the accident.

During the time the Bailey contractors were working on the Harriet Lane, the Court finds that the crewmen's clothing and shoes were strewn about the locker room floor and hanging along the walls. On the day of the accident, articles of clothing were hanging directly next to the hatch, in such a way that they could potentially block the "pin" or "latching mechanism," or otherwise interfere with fully opening and securing the hatch.[11]

### E.  The Accident

Shortly before the accident occurred, Mr. Ross and Mr. Roberts, the only Bailey contractors working on August 16, 2009, finished their work for the day and were cleaning the dry storage area. As they were cleaning, FS2 Wernicke entered the dry storage area to get some supplies. He stayed for a couple of minutes, before leaving through the scuttle to check the chicken he left baking in the oven. When he left, both Mr. Ross and Mr. Roberts were still in the dry storage area.

At some point thereafter, Mr. Roberts climbed the ladder to the locker room, exiting through the scuttle. Mr. Ross stayed below to pass their tools and garbage up to him. Although most of their supplies could pass through the scuttle, they needed to use the main hatch for the larger garbage bags. Mr. Ross remained in the dry storage area while Mr. Roberts sought assistance to open the hatch. According to Mr. Roberts's testimony, one

---

[11] The Court found Plaintiff's evidence on this issue to be more persuasive, even setting aside the photographs it admitted over Defendant's objection at trial. (*See* Pl.'s Exs. 1-4.)

of the "food service specialists" helped him open the hatch.[12] He recalled that the crewman "undogged" the hatch, and then he helped the crewman lift the hatch. He did not see whether the crewman latched the hatch in place, or whether the pin was in the appropriate position. Once the hatch was open, Mr. Ross passed the garbage bags up to Mr. Roberts.

Approximately five minutes passed from the time the hatch was opened to the time Mr. Ross finished with the garbage bags. When all the bags were out of the dry storage area, Mr. Ross began to climb the ladder towards the locker room. As Mr. Ross neared the opening of the hatch, he extended his right arm to reach for a "wheel" located on hatch cover (*see* Joint Exs. 5, 6, 13, 14), which he intended to use to hoist himself up to the locker room. As he grabbed the wheel, he felt the hatch cover move and heard a "click." Concerned, he immediately removed his right hand from the wheel, and attempted to clear the hatch opening as quickly as possible. As he started to descend the ladder, however, the hatch cover shut, trapping his left hand, which was gripping the rim of the hatch opening. (*See* Joint Ex. 39.) Mr. Ross was too shocked to react at first, but within seconds, he realized his hand was stuck, and began yelling for help.

Mr. Roberts could not clearly recall what happened after the hatch cover shut. He

---

[12] FS2 Wernicke testified that he did not help Mr. Roberts open the hatch at this time. FSC Brown, the other food service specialist onboard the ship that day, also testified that he did not help Mr. Roberts open the hatch. At trial, Defendant attempted to establish that there were no other coast guard crewmen on board at the time of the accident who could have helped Mr. Roberts open the hatch. The Court found much of the evidence presented to be unpersuasive or to lack credibility. Moreover, as explained in the "Conclusions of Law" section, regardless of whether Mr. Roberts opened the hatch prior to the accident without assistance from a crewman, the Court would still find Defendant liable for Mr. Ross's injuries because a member of the coast guard **should have** opened the hatch.

9

remembered frantically attempting to open the hatch cover and realizing that one of the "dogs" must have become secured to the deck because the hatch cover was locked in its closed position. He could not remember whether he opened the hatch by himself, or whether he had assistance from a crewman. Nevertheless, the hatch was "undogged," and he attempted to latch the hatch cover open. He felt some resistance when he tried to put the pin in place, and upon closer examination, he noticed a "piece of clothing" blocking the latching mechanism, making it impossible to secure the pin in place. He quickly removed the clothing, and inserted the pin.

FS2 Wernicke's testimony described the events somewhat differently. He recounted that he returned to the locker room just before the accident occurred. He did not know who helped Mr. Roberts open the hatch between the time he exited the dry storage area to go to the galley and the time he returned. FS2 Warnicke testified that he helped Mr. Roberts open the hatch after it fell on Mr. Ross's hand. Unlike Mr. Roberts, he did not recall any difficulty opening the hatch (e.g., because it was "dogged"), and did not remember an article of clothing blocking the locking mechanism. The Court finds Mr. Roberts's version of the events credible and any inconsistencies not consequential to the outcome.

### F. The Injuries

At the time of the accident, the "knife edge" of the hatch cover partially severed Mr. Ross's left middle and ring fingers and amputated his left fifth digit (i.e., "pinkie" finger). Mr. Ross was transported by ambulance to a nearby hospital, where he saw a number of doctors before it was determined to be unlikely his fingers could be fully "saved." He eventually underwent surgery, approximately twelve hours after the accident occurred. After the surgery, he learned that the top section of his third and fourth fingers could not be

reattached, and were amputated, but the doctors were able to reattach his pinkie.

Mr. Ross had to attend months of physical therapy and numerous doctor visits. He was unable to work for approximately five months. By the time of trial, he had reached "maximum medical improvement," but still experienced "burning, burning sensations, tingling, pins and needles, pressure, tightness," and other such pain. His injuries have caused him difficulty in "daily living." He is unable to perform certain housework (e.g., cooking, dish washing, vacuuming, mowing) and can no longer engage in his some of his previous hobbies (e.g., mountain biking). Mr. Ross can no longer play catch with his young son. Aside from the physical implications of his injuries, Mr. Ross remains "self conscious" about the condition of his hand.

Mr. Ross's accident also caused Mrs. Ross to suffer emotional strain. At the time of trial, she and Mr. Ross had been married for six-and-a-half years, and they had one five-year-old son, Tyler Ross. Neither she nor Mr. Ross had ever been married before, and they did not have any other children. Mrs. Ross testified that Mr. Roberts informed her about Mr. Ross's injuries while she was at the home she shared with Mr. Ross in New Jersey, approximately eight hours away. Worried and uncertain about the gravity of her husbands injuries, she had to wait until the owner of Bailey was able to drive her over the eight hour distance to the hospital. Mrs. Ross explained that Mr. Ross's injuries have "impacted their life together." She has had to take on additional tasks to care for the couple's five-year-old son, Tyler Ross, because Mr. Ross's injuries preclude him from doing certain activities. She testified that sometime after the accident, Mr. Ross, being so ashamed of the way his hand looked, asked her if she could "stay married to him."

### III.  CONCLUSIONS OF LAW[13]

The United States Supreme Court case, *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1981), governs whether a ship owner may be held liable for injuries sustained by a longshoreman (including a contractor engaged in repair work) working within the scope of his duties.[14]  Interpreting Section 905(b) of the Act, the *Scindia* Court articulated "three differing standards of care to govern the relationship between the [harbor worker] and the vessel owner."  *Chapman v. Bizet Shipping, S.A.,* 936 F. Supp. 982, 985 (S.D. Ga. 1996).   These duties have been described as follows:

(1)   The first duty, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of repair operations.

(2)   The second duty, the "active control duty" or "active operations duty" applies once repair operations have begun, and requires a shipowner to exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel."  If repair operations have commenced and the shipowner is "actively involved" in the operations, it may be held liable if it has "constructive knowledge" of a hazard to the longshoreman.

(3)   The third duty, the "duty to intervene," applies if the vessel owner is not involved in the repair operations.  "Where [repair] operations have begun and the shipowner is not actively involved, it must have actual knowledge of the hazard before it may be held liable for injuries the longshoreman sustains as a result of that hazard.  In such a case, the shipowner has a duty to intervene to protect the longshoreman only if it has "actual knowledge" of a hazard to the longshoreman.

---

[13]  To the extent that any of the following conclusions of law may represent findings of fact, the Court adopts them as such.

[14]  The parties stipulated that Mr. Ross was a longshoreman, injured on a vessel in navigable waters, and performing longshoreman's duties within the purview of 33 U.S.C. § 905(b).

*See Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98 (1994); *Scindia*, 451 U.S. at 167-78; *Lampkin v. Liberia Athene Transp. Co., Ltd.*, 823 F.2d 1497, 1501 (11th Cir. 1987); *Chapman*, 936 F. Supp. at 985.

### A. The Turnover Duty

At the end of the bench trial, Plaintiff conceded that the facts of this case do not implicate the turnover duty. It is undisputed that Mr. Ross's injury occurred approximately two weeks after he began repair operations on the vessel. The turnover duty relates to the condition of the ship upon the commencement of repair operations, or "prior to the onset of [repair] operations." *See Howlett,* 512 U.S. at 98. Thus, it follows that the "turn over duty" does not apply here, and consideration of this duty is unnecessary. *See Chapman,* 936 F. Supp. at 982.

### B. The Active Operations Duty

#### 1. Triggering the Duty

"[O]nce [repair] operations are underway, the shipowner may be liable if it 'actively involves itself in [repair] operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the [repair] operation." *Lampkin*, 823 F.2d at 1501 (citations omitted). To trigger the "active control duty" or "active operations duty," the vessel owner "must have substantially controlled or been in charge of (i) the area in which the hazard exists, (ii) the instrumentality which caused the injury, or (iii) the specific activities the [harbor contractor] undertook." *Green v. United States of Am.*, 700 F. Supp. 2d 1280, 1303 (M.D. Fla. 2010) (quoting *Davis v. Portline Transp. Mar. Internacional,* 16 F.3d 532, 540 (3d Cir. 1994) (citations omitted)).

"The active operations duty does not require Defendant's exclusive control; concurrent control is sufficient to invoke [this] duty of care." *Id.* (citing *Lampkin*, 823 F.2d at 1502).

The uncontroverted testimony in this case establishes that Defendant exercised "substantial control" or was "in charge of" the hatch and its surrounding area. Lt. Gans clearly intended to maintain substantial control over the workers and the area, as exhibited by his instructions to them concerning their hours and when they could perform "hot work" or weld. Further, according to Lt. Gans's testimony, as contract officer technical representative, he was actively involved in the Bailey contractors' decisions.

Defendant was also "in charge of the instrumentality" which caused the injury, the hatch. S*ee id.* Lt. Gans and CDR Van were charged with policymaking regarding the use of the hatches. Defendant inspected (e.g., CDR Van testified that he had inspected the hatch the morning of the accident) and maintained the hatches (e.g., FS2 Warnicke testified that the "damage control department," headed by Lt. Gans, was in charge of hatch maintenance and care). Further, the Bailey contractors were required to report to a duty officer on the quarter deck every time they opened or closed a hatch. Mr. Ross testified that every morning he would speak to the duty officer to determine which hatches were already "logged open," and he would give him the "numbers of the hatches" the Bailey contractors would need to open to perform their work. The Court finds the evidence in this case clearly shows Defendant maintained substantial control and direction over the contractors to trigger the active control duty.

### 2. Breach of the Duty

In *Davis v. Portline Transportes Mar. Internacional*, the Third District Court of Appeal held that the following elements are required to establish a prima facie case of breach of

14

the active operations duty:

> (1) [T]hat the vessel appreciated, should have appreciated, or with the exercise of reasonable care would have appreciated, the condition; (2) that the vessel knew, or should have known, that the condition posed an unreasonable risk of harm to a longshore worker; (3) that a longshore worker foreseeably might fail to (i) either discover the condition or apprehend the gravity and probability of harm, or (ii) protect himself or herself against the danger; and (4) that the vessel failed to take reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition.

*Davis,* 16 F.3d at 541 (citations omitted).  The evidence adduced at trial shows that each of these factors is clearly established here.

All of the testimony presented indicates that Defendant unquestionably "appreciated" the hazards posed by hatch operation.  Although the hatch at issue was not defective, it was a heavy and potentially dangerous mechanism, the handling of which required specialized knowledge and care.  Defendant considered proper hatch operation essential to the "integrity" of the vessel, and provided crewmen with training to ensure they were aware of the risks involved in opening and closing hatches.  Defendant failed, however, to determine whether the Bailey contract workers had similar training or whether they had the requisite knowledge to ensure their own safety and vessel "integrity."

At the very least, Lt. Gans and CDR Van "had constructive knowledge of a hazard and neglected to . . . warn the [contract workers] about the potential dangers." *Chapman,* 936 F. Supp. at 985.  In other words, Defendant "knew or should have known" that instructing the Bailey contractors to open and close the hatches without coast guard assistance would subject them to an unreasonable risk of harm.  Lt. Gans himself testified that there was a "standard procedure" for opening hatches.  He knew the Bailey contract

was silent on the workers' ability to operate hatches[15] and yet, the only aspect of any such "standard procedure" he conveyed to them was to report to the quarter deck when they opened and closed a hatch.  It was incumbent upon the vessel owner to determine whether the contractors were aware of the hazards involved in hatch operation, or to restrict hatch operations to trained and qualified coast guard crewmen.  The Court finds their failure to make this determination or institute such restrictions constitutes "failure to exercise due care to avoid exposing longshoremen to harm from hazards they [would] encounter in areas, or from equipment, under the active control of the vessel during the [repair operation.]"  *Scindia*, 451 U.S. at 167.

Even if it were permissible for Defendant to assume that the Bailey contractors had received hatch operation training, it "should have known" that failing to keep the locker room clean and orderly at all times created a "dangerous condition," or made hatch operation in that area unreasonably dangerous.  It is undisputed that the clothing in the locker room belonged to coast guard crew members.  Whether or not the photographs admitted into evidence accurately portray the locker room at the time of the accident, the greater weight of the evidence supports a finding that **something** prohibited the latch from being properly secured upon opening.  CDR Van's testimony made clear that the latching mechanism was designed to prevent the hatch cover from falling, and that the pin tolerance

---

[15] Defendant provides no evidence to support Lt. Gans assumption that Mr. Ross or other Bailey contractors would have "no problem opening" and closing the hatches.  Mr. Ross testified the Bailey workers never opened hatches on the vessels.  Prior to working on the Harriet Lane, he had only opened on one other vessel.  Upon doing so, he "got screamed at," and refrained from opening hatches on vessels from that point. Mr. Roberts stated in his deposition testimony that throughout the time he worked on coast guard vessels, he at most "assisted" crew members when they opened hatches, opening only the "scuttles" independently.

16

was tight enough to ensure the cover remained open once the pin was in place. The only plausible explanation offered as to why the latching mechanism failed to engage was Mr. Roberts's testimony that an article of clothing obstructed the pin's entry into the hole of the latching mechanism when the hatch was lifted immediately before the accident or, alternatively, that it was never secured in the first place. Accordingly, the Court also finds that Defendant failed to exercise due care when it failed to maintain the locker room in a safe and orderly condition for the contract workers.

The third factor that Mr. Ross must prove to establish a breach of the active control duty, whether the longshore worker might foreseeably fail to either discover the condition or apprehend the gravity and probability of harm or protect himself against the danger, is easily established. *See Davis,* 16 F.3d at 541. Mr. Ross and the Bailey contractors had no training or experience to enable them to "apprehend the gravity and probability of harm in hatch operation." *Id.* Even if they could "apprehend" it, they had no feasible way to "protect" themselves against the danger. In order to complete their contact work, the contract workers needed to enter areas of the vessel only accessible through the hatches. Although they often utilized the scuttles, their work sometimes required them to open and close the "heavier, more dangerous" hatches, and Lt. Gans informed them that it was their responsibility to open and close those hatches. As such, it was foreseeable that they would engage in hatch operations and fail to protect themselves from the dangers inherent in doing so.

Finally, the evidence shows that Defendant failed to take "reasonably precautionary or remedial steps to prevent or eliminate the dangerous condition." *Id.* This entire accident might have been prevented if Lt. Gans had determined whether the Bailey contractors

received proper hatch operation training before instructing them to open and close the hatches. Having instructed the contractors to engage in hatch operations, Defendant failed to take the "precautionary step" of providing them with the training (which, according to FS2 Wernicke's testimony, may have taken only a couple of hours). If it was not "reasonable" to provide contract workers with hatch training, Defendant could have required the contractors to enlist coast guard crewmen to operate the hatches for them.

Alternatively, Defendant failed to take remedial steps to "eliminate" a dangerous condition because it failed to maintain the locker room in good order, and failed to ensure the hatch's latching mechanism was at all times unencumbered by articles of clothing. For these reasons, the Court finds that the fourth element is clearly satisfied. Accordingly, it finds that Defendant breached the "active operations duty" it owed Mr. Ross.

### C. Duty to Intervene

Having determined that Defendant was actively involved in the contract work and never relinquished full control of any portion of the vessel to the Bailey contractors, the Court finds that the duty to intervene was not implicated in this action. *See Howlett,* 512 U.S. at 98; *Scindia,* 823 F.2d at 1501; *Chapman,* 936 F. Supp.at 985 ("The third duty, commonly called the 'duty to intervene,' applies if the shipowner is not involved in the [repair] operations."). Defendant's liability is clearly derived from its breach of the active operations duty.

### IV. DAMAGES

Under Section 905(b) of the LSHWCA, Mr. Ross is entitled to recover damages under the general maritime law. These damages include (1) medical and rehabilitation expenses; (2) loss of earning capacity; (3) loss of family and personal services; (4) pain and

suffering; (5) psychological and emotional injuries; (6) loss of enjoyment of life; (7) permanent disability and disfigurement; (8) loss of society to dependents; (9) prejudgment interest. *See Treadway v. Societe Anonyme Louis-Dreyfus*, 894 F.2d 161 (5th Cir. 1990); *Randolph v. Laeisz,* 896 F.2d 964 (5th Cir. 1990); *Usher v. M/V Ocean Wave,* 27 F. 3d 370 (9th Cir. 1994).

Considering all relevant facts,[16] the Court awards Mr. Ross $159,326.77[17] for economic losses[18] and $225,000.00 for non-economic losses, for a total amount of $384,326.77. Additionally, the Court awards Mrs. Ross a total of $50,000 for loss of consortium.

## V. CONCLUSION

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED:**

1) Plaintiffs, Joshua Ross and Tara Ross, are **ORDERED** to move for final judgment in accordance with Federal Rule of Civil Procedure 54 on or before March 12, 2012. In the motion, Plaintiff, Joshua Ross, shall include all payments received from collateral sources and the final amount of the

---

[16] In addition to the facts set forth in the "Findings of Fact," Part F., "The Injuries," above, the Court also considered that Mr. Ross was approximately twenty-nine-years-old and Mrs. Ross was approximately twenty-eight-years-old when the injury occurred. Given their ages, the age of their young son, and considering that Mr. Ross had reached "maximum medical improvement," by the time of trial, it is apparent Mr. Ross's injuries will impact him and his family for many decades to come.

[17] This amount is equal to the total workers' compensation lien, including the $30,691.86 Plaintiff noted at trial. (*See* Joint Ex. 49; Pl.'s Ex. 8.)

[18] As the Court indicated during the proceeding, the Court will entertain an application to adjust the amount awarded for economic losses in the event the workers' compensation lien is determined to be different from the amount presented to the Court during the proceeding,

workers' compensation lien, with supporting documentation.

2) Defendant, United States, may respond to Plaintiffs' motion for entry of final judgment on or before March 26, 2012.  Any such response shall address all payments Plaintiff, Joshua Ross, received from collateral sources and the final amount of the workers' compensation lien, with supporting documentation.

**DONE AND ORDERED** in Chambers in Jacksonville, Florida, on February 15, 2012.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record